**KEEFE LAW FIRM**
125 Half Mile Road, Suite 100
Red Bank, New Jersey 07701
(732) 224-9400
(732) 224-9494 (fax)
*Attorneys for Plaintiff and the Proposed Class and Subclasses*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOSEPH SORANNO, individually and on behalf of all others similarly situated, | Civil Action No.  3:18-cv-16218-FLW-LHG |
| Plaintiffs, | |
| vs. | **FIRST AMENDED** |
| HEARTLAND PAYMENT SYSTEMS, LLC, successor in interest to HEARTLAND PAYMENT SYSTEMS, INC., | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| Defendant. | |

Plaintiff, Joseph Soranno ("Plaintiff" and/or "Soranno"), on behalf of himself and others similarly situated (collectively referred to as, the putative "Class" of "Former Sales Representatives"), by way of Complaint against the above-named Defendant Heartland Payment Systems, LLC, successor in interest to Defendant Heartland Payment Systems, Inc. ("Heartland") says as follows:

## INTRODUCTION

1.    Heartland is engaged primarily in the business of processing payment card transactions for Merchants.

2.    Heartland engaged Soranno to solicit orders from customers, in various commission-only sales representative positions.

3.      Heartland purported to build its brand, business model, customer marketing, and sales representative recruitment, upon the concepts of fair dealing and transparency.

4.      For years, Heartland's sales representatives, like Plaintiff, successfully solicited Merchants to process their American Express ("Amex") card payment transactions through Heartland (among other products and services), for Heartland's financial benefit, and in order to earn recurring monthly commissions for same.

5.      While Plaintiff's relationship with Heartland to solicit Merchants was still active, Plaintiff achieved "Vested" status and entered into a Vesting Agreement with Heartland.

6.      The Vesting Agreement guaranteed that Plaintiff would continue to receive his commissions -- even if his relationship with Heartland to solicit Merchants ended -- so long as the Merchants to whom he sold Heartland's processing services for card (like Amex) payment transactions continued to process such transactions through Heartland.  Thereafter, both Plaintiff and his Amex commissions were deemed "Vested".

7.      The Vesting Agreement also provides that Plaintiff's commissions would be paid in accordance with Heartland's Sales Policy Manual ("Sales Policies"), as such manual may be amended from time to time.

8.      After Plaintiff ended his agreement to solicit Merchants for Heartland, he continued to receive his Amex commissions, as a Vested Former Sales Representative, pursuant to the Vesting Agreement and in accordance with Heartland's Sales Policies.

9.      Thereafter, Amex mandated that its card processors (like Heartland) implement a new pricing scheme for its card processing services.

10.    As such, Heartland converted all qualifying Merchants (including Plaintiff's Merchants and the Merchants of its active sales force) to the new pricing for Amex processing services.

11.    Heartland contemporaneously amended its Sales Policies to reflect the commission plan for all sales representatives with Merchant accounts converted to the new pricing.

12.    For a while, Heartland paid Plaintiff Amex commissions under this new commission plan; but then Heartland unilaterally decided (through the illegal actions of its officers and/or agent-managers) to stop paying Amex commissions to Plaintiff and all other Vested Former Sales Representatives.  However, Heartland continued to pay Amex commissions to its active sales representatives for Merchant accounts identically converted to the new Amex pricing.

13.    Plaintiff inquired of Heartland and some of Heartland's executive managers why he was no longer being paid Amex commissions, and Heartland's position, or attempted justification/reason, was that:

> "The American Express program that was sold has ended.  All Merchants on that program had to go through extensive analysis and re-pricings of American Express and therefore are now House accounts."

14.    First and perhaps foremost, that so-called "reason" is not reflected in any policy document, contract, or any other controlling document, in any manner whatsoever.  In addition, Plaintiff did not sell a "program" – rather, he sold a "service" -- namely, Heartland's processing service for Amex transactions.  Moreover, from all relevant perspectives, the "program" change was merely a pricing change for the same product/service; and nothing "ended" – it just converted from one pricing scheme to another.  Finally, upon information and belief, Heartland

had no precedent for its decision or reasons.  In any event, all of that same reasoning should have applied equally to its active sales force, but it did not – as Heartland continued to pay its active sales force, under identical circumstances.

15.    Despite any internal changes Heartland may have undertaken as the result of Amex altering the way it did business and/or any subtle distinctions Heartland might try to make between the old and the new programs, the bottom line is that the new state of affairs still involves:  Plaintiff's same Merchants, accepting the same form of payment (Amex), which transactions are still processed through Heartland, for which the Merchant is charged (more), and for which Heartland makes a profit (more), and for which the active sales force is still compensated.  The only meaningful difference is that Heartland stopped honoring its contractual, statutory, and other obligations to continue sharing a portion of its increased profits with Plaintiff and the Class.

16.    Note that Heartland's then-active sales personnel were (and still are) subject to the same Sales Policies as the Class of Vested Former Sales Representatives.  Yet, Heartland continues to pay commissions to that group for the same type of Merchant accounts that were converted to the new pricing in the same manner --but not to the Class.  Again, Heartland's own words reveal that all Merchants had to go through extensive analysis and re-pricing – including those of its inactive and active sales force alike.  Yet, again, Heartland continued to pay Amex commissions to its active sales representatives -- but not to its Vested Former Sales Representatives, like Plaintiff.

17.    Purportedly in order to cover the cost of "extensive analysis", "re-pricings", program changes, and adjustments, Heartland added an "Exhibit E Transaction Expense" of $0.08 cents to the converted Merchant accounts of its then active sales representatives.  It is

inconceivable then, why Heartland would even try to use these same issues as fabricated obstacles against continued payment to the Class of Vested Former Sales Representatives – when it simply could have continued to apply the new compensation policy to both groups equally, as it always had in the past.

18.    Heartland, without legal justification or notice, and in breach of contract, violation of statutes and common law, wrongfully terminated Amex commission payments to Plaintiff and the Class.

19.    There is no provision, language, or term in any controlling document (or elsewhere for that matter) that supports Heartland's stated reason for terminating the subject commissions.

20.    Moreover, Heartland refused to notify its Vested Former Sales Representatives of the changes to their compensation; and in fact, upon information and belief, Heartland's policies actually prohibited the communication of compensation changes to Vested Former Sales Representatives.  Such behavior was in clear violation of the New Jersey Wage Payment Law, N.J.S.A. 34:11-4.1 et seq. (the "NJWPL"), which required Heartland to notify the Class "of any changes in the pay rates … prior to the time of such changes".  N.J.S.A. 34:11-4.6.b.

21.    The Vesting Agreement clearly requires that Heartland continue paying commissions to Plaintiff so long as Plaintiff's Merchants continue to process transactions through Heartland; and Plaintiff's Merchants have continued to process transactions through Heartland.

22.    Neither the Vesting Agreement nor the Sales Policies makes commissions contingent upon a "program" continuing.  Plaintiff sold a "service", and the Vesting Agreement

guarantees his commissions for the service he sold – not the particular pricing program dictated/offered by the card issuer at any given time.

23.    Any contrary interpretation of the controlling documents (which were drafted solely by Heartland) could only have been made in bad faith.

24.    Heartland continues to receive income as the result of Plaintiff's Merchants continuing to process Amex transactions through Heartland.

25.    Upon information and belief, Heartland is making more profit under its new Amex pricing scheme than it did under its old Amex pricing scheme.

26.    Moreover, Merchant accounts which may have aged-out under Amex's old pricing and became non-revenue producing for Heartland before the conversion but which continued processing through Heartland post-conversion, resumed generating revenue for Heartland under the new pricing.  Yet, Heartland no longer shares with the Class the portion of those increased and revived profits it contractually (and otherwise, repeatedly) promised to the Class.

27.    Every month since Heartland stopped paying the subject earned commissions to Plaintiff, during which Plaintiff's Merchants generate revenue for Heartland, Heartland was required by the NJWPL to timely pay such commissions to Plaintiff when the exact amount could be computed.  N.J.S.A. 34:11-4.3.

28.    Plaintiff is further protected by the Sales Representatives' Rights Act, N.J.S.A. 2A:61A-1 et seq. (the "SRRA"), which requires Heartland to continue paying earned commissions to the Plaintiff within 30 days of when the commissions are due – which is each and every month during which Plaintiff's Merchants generate revenue for Heartland since Heartland stopped paying the subject commissions.  N.J.S.A. 2A:61A-2.

29.     Plaintiff individually, and on behalf of all other similarly situated Vested Former Sales Representatives of Heartland who lost their Amex commissions, brings claims for: breach of contract, unjust enrichment, and violations of the NJWPL and the SRRA.

30.     Plaintiff seeks back-pay for the earned but unpaid commissions, as well as reinstatement of future earned commission payments, treble damages, contractual and statutory attorneys' fees and costs, and such other further relief as this Court deems appropriate.


## PARTIES

31.     Plaintiff, Joseph Soranno, is a resident of Bayville, New Jersey.

32.     Upon information and belief and at all times mentioned in this Complaint, Defendant Heartland is a domestic profit corporation authorized to do business under the laws of the State of Delaware.

33.     Upon information and belief and at all times mentioned in this Complaint, Heartland's main business address is in the Township of Princeton, County of Mercer, State of New Jersey.


## BACKGROUND

34.     Heartland hired Soranno in January 2007, as a Relationship Manager, a sales representative position.

35.     Upon information and belief and at all times relevant herein, all sales representative positions at Heartland are commission only – i.e. with no base pay.

36.     Upon information and belief and at all times relevant herein, all sales representative positions, at all levels,  with Heartland are eligible to attain "Vested" status, which

enables the sales representative to continue earning commissions even after their agreement to solicit Merchants for, or other relationship with, Heartland ends – i.e. as if they were still actively soliciting Merchant orders for Heartland.

37.    During his years with Heartland, Soranno successfully solicited and "signed-up" Merchants to process Amex transactions though Heartland (among other products or services offered by Heartland).

38.    Effective in or about February or March of 2008, Soranno achieved Vested status; and he executed Heartland's form Vested Relationship Manager Agreement ("RM Vesting Agreement").

39.    Upon information and belief and at all times relevant herein, Heartland used the same RM Vesting Agreement for all Relationship Managers.

40.    In April 2008, Soranno took a new sales position as a Territory Manager; and he executed Heartland's form Territory Manager / Senior Territory Manager Agreement ("TM/STM Agreement").

41.    Upon information and belief and at all times relevant herein, Heartland used the same TM/STM Agreement for all Territory Manager s and Senior Territory Manager s.

42.    The RM Vesting Agreement guarantees Plaintiff's contractual right to receive, and Heartland's contractual obligation to pay, commissions to Plaintiff on Merchant accounts he signed-up while holding the Relationship Manager position, as follows:

> "As a Vested RM, …, RM shall continue to receive Residual Commissions <u>so long as Merchants signed by RM continue to process … transactions … through [Heartland]</u> …." (emphasis added)

43.    The RM Vesting Agreement also provides that Plaintiff "shall receive compensation in accordance with the provisions of the [Heartland] Sales Policy Manual <u>as such manual may be amended from time to time</u>."   (emphasis added)

44.    Similarly, the TM/STM Agreement provides that:

"Once Vested, …, TM/STM shall continue to receive Residual Commissions <u>so long as Merchants signed by TM/STM continue to process … transactions … through [Heartland]</u> …." (emphasis added)

45.    The TM/STM Agreement also provides that:

"TM/STM shall receive over-ride compensation for Merchants signed by Relationship Managers within his or her Territory in accordance with the provisions of the [Heartland] Sales Policy Manual <u>as such manual may be amended from time to time</u>.  TM/STM shall receive Relationship Manager compensation for all direct Merchant sales as defined in [Heartland] Sales Policy." (emphasis added)

46.    So, despite any language or operation of contract law regarding the later agreement potentially superseding the earlier one, the RM Vesting Agreement and the TM/STM Agreement both vest/guarantee the commissions Plaintiff earned (through the  successful solicition of Merchant sales) at the time he held the position corresponding to the respective agreement, so long as Plaintiff's Merchants continue to process through Heartland.  In addition, both agreements reference the HPS Sales Policy Manual for specific compensation details.

47.    Due to the identical operative Vesting language in both agreements, they are interchangeably and/or collectively referred to throughout this pleading as the "Vesting Agreement".

48.    According to the Sales Policies themselves, a series of separate formal documents, with various "Revised" dates, together with written policy communications sent via email by corporate (collectively referred to herein as Heartland's "Sales Policies"), constitute the "HPS Sales Policy Manual" referenced in the Vesting Agreement.

49.    Vested Former Sales Representatives in the following positions (without limitation) are adversely impacted by Heartland's decision to terminate the subject earned Amex

commissions: Relationship Manager, Territory Manager, Senior Territory Manager, Division Manager, and Regional Manager (collectively referred to herein as "Class Members").

50.     Upon information and belief, each member of the Class signed at least one type of form Vesting Agreement (either the same form RM Vesting Agreement as the one Plaintiff executed, or another position-specific Vesting Agreement like the TM/STM Agreement Plaintiff signed) with language regarding "Vesting" and "compensation" that is identical to, or in all relevant ways substantially similar to, the operative language in Plaintiff's Vesting Agreement.

51.     In December 2012, Soranno voluntarily ended his active solicitation relationship with Heartland.

52.     Thereafter, Heartland continued to pay Soranno his Vested Amex commissions, in accordance with the Sales Policies; and Heartland continues to pay Plaintiff commissions on the other products/services he sold , to present.

53.     In early 2014, Amex announced that it changed its pricing for card transaction processing; and Amex mandated that all of its card processors, like Heartland, had to convert Merchants to the new pricing during 2014.  Note that the program name of Amex's old pricing program was OnePoint, and the new pricing program is called OptBlue.

54.     During the conversion, Plaintiff was still subject to restrictive covenants in the Vesting Agreement not to solicit any of Heartland's Merchants.

55.     Heartland behaved with improper motive in that it took advantage of Plaintiff's restrictive covenants, and the entirety of this situation, by delaying termination of the commissions and by not providing any advance notice of such termination, until *after* the Merchants were all converted to Heartland's new higher pricing.  By that point, the Merchants were no longer vulnerable to potential competitive efforts to switch them to another processor.

56.     Upon information and belief, the Heartland Service Center – not active sales representatives – handled the entire process of converting Merchants to the new pricing. Merchants did not sign a new contract, and they did not have to change their Point-of-Sale equipment.  The process did not even require a single sales call or visit from an active sales representative.  All a Merchant had to do in order to "opt-in" to the new pricing was to swipe a customer's card after the pricing conversion.  The Merchants did not request any of this – it was all driven by, and imposed on them by, Amex and Heartland.

57.     In a June 13, 2014 letter advising Merchants of the launch of the new Amex pricing program, Heartland stated that:  "**There is nothing you need to do.**  Simply continue to process American Express Card Transactions exactly the way you do today – we'll take care of the rest."  (emphasis in original)

58.     Again, the pricing conversion was not the Merchant's choice; and the Merchant did not place an order for, or otherwise request, a new product or service.  Rather Amex mandated, and Heartland's non-sales personnel implemented, the new pricing scheme.

59.     The product/service Plaintiff sold to the Merchants was the same before, during and after conversion to the new pricing:  Amex transaction processing.  In addition, there was only one "sale" made per Merchant – i.e. when Plaintiff convinced the Merchant to process Amex transactions through Heartland.  Anything that occurred after the original sale is merely the Merchant opting to continue processing its Amex transactions through Heartland at a new price.  That is not a new sale, of a new product or service, or a new program – it is just a price change to an existing customer.

60.     In fact, Heartland had very specific criteria for what constitutes a new and/or returning customer, for commission purposes; and the present situation does not meet those criteria – not for active sales representatives or Vested Former Sales Representatives.

61.     Upon information and belief, Heartland's corporate representative and Chief Sales Officer, Tony Capucille, sent a series of emails in October and November of 2014, regarding the Sales Policies for commissions on converted Amex accounts.

62.     These emails amended Heartland's Sales Policies, and they are therefore part of the binding agreement between the parties; because the Vesting Agreement binds the parties to the "as amended" Sales Policies.

63.     Upon information and belief, in 2015 or later, Heartland eventually more formally revised its Sales Policies to reflect the new commission plan for Amex processing services under the new pricing.    Any such subsequent formal "Revised" (or release-dated) formal policy documents reflecting compensation for converted Amex accounts is part of the binding agreement between the parties; because, again, the Vesting Agreement binds the parties to the "as amended" Sales Policies.

64.     Heartland paid monthly Amex commissions in December 2014 and January 2015, in accordance with the amended Sales Policies, to all of its active sales representatives as well as Plaintiff and the Class of Vested Former Sales Representatives.

65.     Plaintiff experienced a spike (nearly double) in the amount of his Amex commissions for December 2014 and January 2015 – which is just one indication of how Heartland makes even more money from his Merchants under the new pricing than it did under the old pricing.

66.    Then, in February 2015, Heartland unilaterally stopped paying Amex commissions to only Plaintiff and the Class – in breach/violation of its Vesting Agreement and Sales Policies, and in violation of the NJWPL and SRRA.

67.    Also in February 2015, Plaintiff made email inquiries to Heartland about why he was no longer being paid Amex commissions.  Again, the NJWPL required Heartland as well as its officers and agent-managers to provide notice of compensation changes <u>before</u> those changes were made – not after.

68.    Several of Heartland's executive management repeated the following, apparently official, company response:

> "The American Express program that was sold has ended.  All Merchants on that program had to go through extensive analysis and re-pricings of American Express and therefore are now House accounts …."

69.    Note that Heartland's then actively-soliciting sales representatives are subject to the same Sales Policies as Plaintiff and all other Vested Former Sales Representatives; and that the Amex program ended for the Merchants of both groups at the same time and in the same manner.  Yet, Heartland inexplicably and inexcusably continues to pay commissions to its active sales force, but not to Plaintiff and the Class of Vested Former Sales Representatives.

70.    Per the terms of Heartland's Vesting Agreements, the Sales Policies, and any other document or communication published by Heartland, Vested Former Sales Representatives are in the same position as active sales representatives – particularly, as relates to the payment of commissions.

71.    Also, there is no provision, language, or term in any controlling document (or elsewhere for that matter) that supports Heartland's purported reasons for terminating the subject commissions.

72.     Based on Heartland's obviously manufactured and non-credible reasons, Plaintiff maintains that Heartland's decision was driven by improper motives.

73.     Upon information and belief, Heartland (and Amex) represented to Merchants that the transition from Amex's old program to the new one was a simple pricing change (supposedly lower), with consolidated statements and simpler processing and servicing.  Again, this indicates substantial similarity between the old and new pricing programs – not a "new program" or product/service (for which Heartland would likely insist is not eligible for compensation).

74.     During the course of Plaintiff's years of active solicitation for Heartland, card issuers like Amex periodically changed the names of, and pricing for, their program offerings to Merchants – sometimes triggering Heartland to modify its commission rates; but Heartland never before (to Plaintiff's knowledge) eliminated commissions altogether in these situations – that is, not until the particular situation giving rise to this lawsuit.

75.     Upon information and belief, Heartland's executive management consistently represented that:  when Heartland is making profits from a relationship that a salesperson built, Heartland focuses on ensuring that it is sharing a healthy portion of those earnings with that salesperson.  Heartland is no longer sharing its profits from the Merchant relationships Plaintiff and the Class built.

76.     In bad faith, and with improper motive, Heartland did not provide any warning or notice to Plaintiff of the drastic reduction (over $1,500.00 per month) in his livelihood caused by Heartland's decision.

77.     Vested Former Sales Representatives, like Plaintiff, are not wealthy; and they came to rely on all of their commissions within their respective household budgets.  In addition

to the contractual illegality of Heartland's conduct, it is simply cruel to take anticipated income away from them without any advance notice that could have enabled them to plan accordingly.

78.    Upon information and belief, Heartland has a company-wide policy prohibiting the communication of compensation (or other) policy changes to Vested Former Sales Representatives – despite Heartland's attempts, in form agreements, to bind said Vested Former Sales Representatives to the Sales Policies and amendments to them.  To wit, all of Heartland's form Vesting Agreements require that: "RM shall follow all policies and procedures described in the Sales Policy Manual."  Heartland's attempt to shackle Plaintiff to covenants restricting him from competing for or soliciting Merchants, and binding him to ever-changing Sales Policies – while deliberately refusing to communicate any policy changes to Plaintiff, and deliberately excluding Plaintiff from notice of the subject Amex commission policy changes, is another example of Heartland's bad faith conduct and improper motives.

79.    In addition, Heartland does not permit Vested Former Sales Representatives access to the underlying data upon which earned Vested commissions are calculated – leaving Plaintiff and the Class further at the mercy of Heartland's abuse of its unilateral authority over key terms and conditions of the relationship between the parties.

80.    Heartland further demonstrates its improper motives (and the illegality of its decision) through its inconsistent treatment of two groups situated substantially and substantively the same.  To this day, Heartland continues to pay commissions on Amex accounts of its then-active sales force converted in an identical manner to Plaintiff's accounts – despite the fact that the compensation of such active sales force was (and still is) governed by the same Sales Polices that apply equally to Plaintiff and the Class of Vested Former Sales Representatives.

81.    Upon information and belief, at the time Heartland decided to stop paying the subject Amex commissions, it was facing increased competition from other payment processing companies that were expanding their businesses into Heartland's primary market of small to medium-sized enterprises ("SMEs").  For example, Heartland filed an antitrust lawsuit in 2014 against Mercury Payment Systems, LLC, claiming that Mercury was charging Merchants undisclosed fees, in an attempt to keep that direct competitor of theirs for SMEs (particularly restaurants and retailers) in check.

82.    Heartland could not afford to alienate their active sales force at that critical time in the company's existence; so it cheated money from the only group it could afford to swindle: Former Sales Representatives – with respect to whom Heartland stood nothing to lose because they are not a source of future sales.

83.    A team of Heartland's executive managers (led by final decision-maker: founder and former CEO, Robert O. Carr) concocted (over a period of many months) an excuse for their illegal decision to stop paying the subject commissions, and many of them were also shareholders.  Around the relevant time, these same Heartland shareholder-executive managers were attempting to sell or merge the company, and therefore had a strong financial incentive to reduce expenses/commissions to make Heartland a more attractive merger candidate and/or acquisition target.  This is yet another indication of the improper motives behind Heartland's bad faith decision to take Vested income away from Plaintiff and the Class.

84.    Also at this same time, Heartland over-charged and allegedly illegally back-billed its Amex Merchants (after promising to lower their charges), under the guise of Amex's new pricing scheme.  This move dramatically increased Heartland's profits on Amex processing services.  This conduct also landed Heartland in a class action lawsuit by the Merchants (*Rudel*

*Corp. v. Heartland*, U.S. District Court, D.N.J., 3:16-cv-02229-AET-LHG).   The Merchants'

class action is further indication of Heartland's then-desperate attempt to improve its bottom line

in order to attract a merger/acquisition before the competition could further hurt them financially.

Upon information and belief, the Merchants received a several-million-dollar settlement from

Heartland as the result of this behavior.  That case is also a good example of Heartland's pattern

of breaking its promises.  It is also an example of Heartland's brazen refusal to give warning or

notice to a contracted party, when it is going to deliberately adversely impact that party

financially.

85.     Note that Heartland did not pay commissions to Plaintiff on the amounts it

received as the result of the late-2014 back-billing of Amex Merchants; and that Plaintiff seeks

compensation for same in this action.

86.     While Heartland was artificially trying to improve its bottom line, its founder and

former CEO, Robert O. Carr, was touting Heartland's brand and business model of transparency

and fair dealing (directly, via media, and as reflected in its Sales Professional Bill of Rights and

Merchant Bill of Rights) to the market of potential buyers.

87.     Upon information and belief, Mr. Carr initially considered "buying-out" the

subject commissions – i.e. paying a large multiple (typically 30 times) of the monthly average

commissions in a lump sum, in lieu of paying recurring future commissions owed.

88.     Further upon information and belief, Mr. Carr (on behalf of Heartland) later

reversed course by suspiciously, in bad faith and with bad motive, taking the untenable position

that the new Amex pricing program was the equivalent of a "new product" (e.g. like payroll

processing services), and therefore it was not commissions-eligible for Vested Former Sales

Representatives.

89.     Yet, any person in the card processing industry – much less one as experienced as the founder of Heartland – knows that Amex card processing services under a replacement pricing program mandated by the card issuer (Amex) does not even remotely resemble the equivalent of an existing customer ordering an entirely new and different product like payroll processing services.  This willful ignoring of an obvious fact further highlights Defendant's bad faith and improper motives.

90.     All of the subject Merchants merely continued to process Amex card transactions through Heartland – they did not order a new product.  Rather, Amex imposed new pricing on them if they wished to continue accepting Amex cards in the course of their business.  To suggest otherwise is a disingenuous act of bad faith by Defendant in the performance of the subject contract.

91.     Apparently, the questionable motives and efforts of Heartland's founder/CEO and other executive managers were successful.  By December 2015, Global Payments, Inc. ("Global") announced that it entered into an agreement to acquire Heartland.

92.     By April 2016, Global's merger with Heartland was complete.

93.     By July 2018, the Securities and Exchange Commission charged Heartland's founder and former CEO, Robert O. Carr, in an insider-trading scheme connected to Heartland's merger with Global.

94.     In hindsight, Heartland's motives for cheating Vested Former Sales Representatives, as well as Merchants, out of millions of dollars, are clearer.

95.     Prior to Heartland's illegal cessation of the subject commissions, it strived to portray a consistent culture, and to set a common expectation among all of its sales

representatives, in a wide variety of its recruiting, advertising, solicitation, and other company publications, for example, but not limited to:

a)   The aforementioned Sales Professional Bill of Rights (SPBOR"), established in around 2012 – promised, among other things, the following to its sales personnel: (i) "[t]he right to the opportunity to earn and own a portion of the recurring revenues added to the employer's income statement"; and (ii) a "clearly explained and meticulously practiced" "system for calculating and paying commissions".  Heartland obviously falls far short of fulfilling both of these promises.

b)   Heartland's 2014 10-K: "We pay our salespersons residual commissions based on the gross margin generated from the monthly processing activity of … Merchant accounts signed by them. We refer to these residual commissions as the 'owned' portion of such commissions, or 'portfolio equity'. <u>The salesperson has no obligation to perform additional services for the Merchant for so long as the Merchant continues processing with us</u>." … "<u>Vested status entitles the salesperson to his or her residual commissions for as long as the Merchant processes with us, even if the salesperson is no longer employed by us</u>." (emphasis added).

c)   The      recruiting      section      of      Defendant's      website (www.heartlandpaymentsystems.com/careers), under the "Sales" heading, states:  "At Heartland, your expertise is valued and rewarded.  We inspire our salespeople to build a personal portfolio – not just earn income.  While other sales job salaries may depend on a base pay with incentives, we offer no

restraints with 100 percent commission-based salary.  Our model not only pays you unlimited commission while you work for us, but also is uncapped, <u>creating lifetime residuals that build wealth even after you retire or leave the company</u>." (emphasis added)

d) Defendant published a White Paper entitled "Income Does Not Equal Wealth", on the internet, which states:  "'Portfolio ownership' builds wealth for Vested sales representatives for the <u>lifetime of each account in their portfolio</u> (even if they choose to leave the company)." (emphasis added)

96.    Defendant obviously and consistently acknowledges, in all places, that Vested commissions should survive for the lifetime of the Merchant <u>account</u> – not the lifetime of the card issuer's particular pricing program.

97.    During Plaintiff's tenure as a TM for Heartland, he recruited sales representatives for the company by communicating these same concepts that he later learned were all company lies.

98.    Despite its contractual, statutory and other obligations, company policy, history, culture, and clear effort to set sales representatives' expectations to the contrary, Heartland stopped paying Amex commissions to Vested Former Sales Representatives after January 2015 – without warning, notice, explanation, or justification.

## CLASS ALLEGATIONS

99.    Pursuant to 28 U.S.C. § 1332(d) and 29 U.S.C. § 201, this action may properly proceed as a class action.  Plaintiff brings this action on behalf of himself and all other persons similarly situated – the putative "Class Members".  The Class is initially defined as follows:

> **All Vested Former Sales Representatives of Defendant, who stopped receiving commissions in pay-month February 2015, for Merchant accounts that continued to process American Express transactions through Defendant after conversion to the OptBlue pricing scheme; and who were not terminated for cause, or adjudicated to have violated any agreements.**

100.    This Class excludes any judge or magistrate assigned to this case, Defendants and any entity in which Defendants have a controlling interest, and Defendant's officers, directors, legal representatives, successors, and assigns; and their immediate family members.

101.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of these claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

102.    There are questions of law and fact that are common to all Members of the Class, which predominate over any question affecting only individual Class Members.

103.    The principal common issues include, but are not limited to, whether Defendant breached its Agreements with Plaintiff and the Class Members or, in the alternative, whether Defendant was unjustly enriched; and whether Defendants violated the NJWPL or the SRRA.

104.    The operative language of the subject Vesting Agreements and Sales Policies is uniform for the entire Class.

105.    Plaintiff's claims are typical of the claims of the Class because the claims are based on the same legal and remedial theories, and each Class Member was not paid, or underpaid in some way, in breach of contract, and in violation of law.

106. The Class is readily identifiable from Defendant's pay records.

107. The prosecution of separate actions by individual Class Members would run the risk of inconsistent or varying adjudications, which could establish incompatible standards of conduct for the Defendant in this action. Prosecution as a class action will also eliminate the possibility of repetitious litigation.

108. The prosecution of separate actions by individual Class Members would create the risk that adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of absent Class Members, or substantially impair or impede their ability to protect their own interests.

109. Plaintiff Soranno will fairly and adequately protect the interests of all Class Members in the prosecution of this action and in the administration of all matters relating to the claims stated herein.

110. Plaintiff Soranno is similarly situated with, and has suffered similar injuries as, the Class Members that he seeks to represent.

111. Plaintiff has no interests antagonistic to those of the rest of the Class.

112. Plaintiff Soranno has retained counsel experienced in complex litigation and class action cases.

113. Neither Plaintiff Soranno nor counsel has any interest that may cause them to not vigorously pursue this action.

114. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, because:

    a) Concentration of the litigation concerning this matter in this Court is desirable;

    b) Failure of justice will result from the absence of a class action;

c)      The Class and the difficulties likely to be encountered in the management of this class action are negligible; and

d)      The Class is so numerous as to make it impracticable to join all Members of the Class as plaintiffs.  Upon information and belief, there are approximately 300 members of the Class.

115.    Defendant has acted or refused to act on grounds generally applicable to Plaintiff and all Class Members, thereby making it appropriate to seek/grant final injunctive relief with respect to the Class as a whole.

## COUNT ONE
### (Breach of Contract)

116.    Plaintiff repeats and re-alleges the allegations set forth in all other paragraphs of this Complaint as if they were set forth in full herein.

117.    On behalf of and under agreement with Heartland, Plaintiff solicited orders for Heartland's products and services from Merchants, and he sold Heartland's Amex transaction processing services to such Merchants.

118.    Heartland benefitted, and continues to benefit, financially and otherwise from such Merchant relationships established by Plaintiff.

119.    Plaintiff executed Defendant's Vesting Agreements; and Plaintiff agreed to, among other things, solicit Merchant sales for Heartland in exchange for commission-only compensation.

120.    Unless the agreement for Plaintiff to solicit Merchants for Heartland was terminated for cause, the Vesting Agreement obligated Heartland to continue paying Amex commissions to Plaintiff, so long as Plaintiff's Merchants continued to process through Heartland.

121.    Plaintiff's agreement to solicit was not terminated for cause.    Rather, he voluntarily terminated said agreement.

122.    Plaintiff did not otherwise violate any agreement.

123.    Plaintiff's Merchants continue to process Amex transactions through Heartland.

124.    Defendant breached its obligation in its Vesting Agreement by failing to pay Amex commissions to Plaintiff since January 2014; and Defendant continues such breach to the present.

125.    Defendant also breached its obligation under the Vesting Agreement by failing to pay Plaintiff commissions on the amounts it back-billed Plaintiff's Merchants in around October 2014.

126.    Plaintiff brings these breach claims under the laws of the State of New Jersey, in compliance with the choice of law provision in the Vesting Agreement.

127.    As a result of Defendant's continued breach, Plaintiff and the Class Members have suffered damages.


**COUNT TWO**
**(Unjust Enrichment)**

128.    Plaintiff repeats and re-alleges the allegations set forth in all other paragraphs of this Complaint as if they were set forth in full herein.

129.    In the alternative to a finding of a valid, binding, and enforceable agreement between the parties that governs Heartland's obligations and/or Plaintiff's rights specifically with respect to the subject Amex commissions, Plaintiff alternatively pleads that Heartland was unjustly enriched by its conduct.

130.    The Amex OptBlue program is substantively the same as the OnePoint program (from which the subject Merchants were converted), as evidenced by the facts that new contracts were not even required from Merchants.  The "service" was the same, and the "program" was merely a new pricing scheme.  In addition, sales personnel did not even have to contact the Merchants to discuss any changes and/or to seek authorization to the conversion – rather the conversion was automatic.

131.    As relates to Plaintiff's compensation, the service sold to his Merchants is the same:  Amex transaction processing.

132.    Plaintiff conferred a benefit upon Heartland by signing Merchants up to process Amex transactions through Heartland; and Plaintiff reasonably and objectively expected remuneration from Heartland at the time he conferred that benefit.

133.    In addition, Plaintiff conferred a benefit upon Heartland by refraining from soliciting the Merchants he signed up to process Amex transaction through Heartland; and Plaintiff reasonably and objectively expected continued remuneration from Heartland at the time he conferred such benefit.

134.    Heartland continues to receive income from the Merchant relationships for Amex processing services that Plaintiff established for Heartland's benefit.

135.    Heartland's retention of this benefit that Plaintiff conferred upon it is unjust and inequitable.

136.    Heartland's continued receipt of this benefit without payment to Plaintiff is unjust and inequitable.

137.    Heartland's conversion of Plaintiff's Merchant accounts to "house accounts" is unjust and inequitable.

138.    Heartland has been enriched by its acts, omissions and/or contractual breaches as described in Count One above.

139.    Heartland's acts, omissions and/or contractual breaches allowed Heartland to acquire the use and benefit of Plaintiff's and the Class Members' Vested commissions that Heartland would not have acquired but for its acts, omissions and/or contractual breaches.

140.    Heartland has been unjustly enriched as a result of its acts, omissions and/or contractual breaches.

141.    Plaintiff and the Class Members suffered damages due to Heartland's acts, omissions and/or contractual breaches.

142.    Heartland lacks any legal justification for having engaged in the acts, omissions and/or contractual breaches alleged herein at Plaintiff's and the Class Members' expense.

143.    Heartland wrongfully enriched itself at the expense of Plaintiff and the Class by paying Vested Amex commissions for years after Plaintiff terminated his solicitation agreement, only to later, prospectively and retroactively, stop paying such commissions under the false pretense of a "program" ending.

144.    No other remedy at law can adequately compensate Plaintiff and the Class Members for the damages occasioned by Heartland's conscious choice to engage in the acts, omissions and/or contractual breaches alleged herein.


## COUNT THREE
### (Violations of the NJWPL)

145.    Plaintiff repeats and re-alleges the allegations set forth in all other paragraphs of this Complaint as if they were set forth in full herein.

146.    Heartland is considered an employer for purposes of the New Jersey Wage Payment Law, N.J.S.A. 34:11-4.1 et seq. ("NJWPL").

147.    Plaintiff and all putative Class Members are employees for purposes of the WPL.

148.    From the time that Plaintiff ended his active relationship with Heartland (December 2012), through and including the conversion of Merchants to Amex's new pricing (May 2014 to November 2014), Heartland continued paying direct monetary compensation in the form of taxable wages ("AmexOnePointRes" commissions of approximately $750.00 per month) to Plaintiff under the old Amex pricing, for the Merchants he had previously, successfully, solicited to process their Amex card transactions through Heartland.

149.    During the conversion of Merchants to Amex's new pricing, Heartland purportedly paid Plaintiff's commissions based on historical – instead of actual -- transaction processing volume of his Merchants.  Heartland did not, however, notify Plaintiff of such change to his pay.

150.    Then, for at least 2 months after the conversion of Merchants to Amex's new pricing, Heartland was paying direct monetary compensation, in the form of taxable wages, to Plaintiff under the new Amex pricing, for the Merchants he had previously, successfully, solicited to process their Amex card transactions through Heartland.  In particular, Heartland paid Plaintiff "AMEX OptBlueRes" commissions of $1,675.66 in December 2014 and $1,852.79 in January 2015.

151.    Thereafter, without any notice or warning, Heartland changed Plaintiff's pay, by reducing his commission payments for his Amex Merchants to zero.

152.    The NJWPL required Heartland to notify Plaintiff of changes to his pay prior to the time of such changes.  N.J.S.A. 34:11-4.6.  Heartland failed notify Plaintiff of changes to his

pay on at least three occasions: when his commissions were purportedly changed from actual to historical calculations, when his rate essentially doubled, and when his rate was reduced to zero.

153.     The repeated failures of Heartland to notify Plaintiff and the Class are all separate violations of the NJWPL.

154.     The NJWPL protects Plaintiff for as long as he is owed earned commissions. Heartland owes Plaintiff commissions for all months since January 2015.

155.     The repeated failures of Heartland to timely pay Plaintiff's earned but unpaid commissions are also all separate violations of the NJWPL.

156.     In fact, each day during which Heartland continues to not pay or notify constitutes a separate and distinct violation.

157.     As a result of the Defendants' violations of the NJWPL, Plaintiff has been damaged.


### COUNT FOUR
### (Violation of the SRRA)

158.     Plaintiff repeats and re-alleges the allegations set forth in all other paragraphs of this Complaint as if they were set forth in full herein.

159.     Heartland is a principal for purposes of The Sales Representatives' Rights Act, N.J.S.A. 2A:61A-1 et seq. (the "SRRA").

160.     Plaintiffs and all putative Class Members are sales representatives for purposes of the SRRA.

161.     Pursuant to Fed. R. Civ. P. 8(d)(2)&(3), Plaintiff may plead alternate or potentially inconsistent theories of liability.

162.    The SRRA protects Plaintiff's commissions for the Merchants he had previously, successfully, solicited to process their Amex card transactions through Heartland, while the agreement for Plaintiff to solicit such sales for Heartland was still in effect, even if accepted by Heartland, delivered, and paid for after the end of the agreement.  N.J.S.A. 2A:61A-2.

163.    In particular, the SRRA requires Heartland to continue paying earned commissions to the Plaintiff within 30 days of when the commissions are due – which is each and every month during which Plaintiff's Merchants generate revenue for Heartland since Heartland stopped paying the subject commissions.

164.    The failure of Heartland to pay Plaintiff's earned but unpaid commissions each month constitutes violations of the SRRA.

165.    As a result of the Defendants' violations of the SRRA, Plaintiff has been damaged; and the SRRA entitles Plaintiff to the recovery of treble damages, attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court issue an Order and grant Judgment to the Plaintiff and the Class Members as follows:

a)    Certifying this action as a Class Action pursuant to Rule 4:32 of the New Jersey Court Rules;

b)    Naming Plaintiff Joseph Soranno as the representative of the absent Class Members;

c)    Appointing Keefe Law Firm as Class Counsel for all purposes in this action;

d)    Granting Plaintiff and Class Members compensatory and statutory relief, treble damages, common law and punitive damages, and applicable pre- and post-judgment interest, in full recompense for their damages;

e)    Enjoining Defendant from violating any applicable contracts for payment of compensation to Plaintiff and the Class Members and from violating any applicable statutory or case law;

f)    Entering judgment according to the injunctive, equitable and declaratory relief sought;

g)    Granting Plaintiff and Class Members such other and further relief as the Court deems just in all the circumstances;

h)    Granting an Incentive Award to Plaintiff as Class Representative for his impartial, loyal and dedicated service to the Class; and

i)    Granting Class Counsel an award of their attorneys' fees and costs of suit, reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, in light of the Court's judgment

informed by awards in other similar cases of comparable difficulty and complexity.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all of the issues contained herein.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, John E. Keefe, Jr., Esq. is hereby designated as trial counsel for Plaintiff in the within matter.

**KEEFE LAW FIRM**
*Attorneys for the Plaintiffs*

Dated: July 29, 2019                    By:  */s/ Paul A. DiGiorgio*
                                        **PAUL A. DIGIORGIO**
                                        For the Firm