**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JOSEPH SORANNO, individually and on behalf of all others similarly situated, | : : : | |
| Plaintiff, | : : | Civil Action No. 18-16218 (FLW) (LHG) |
| v. | : : | **OPINION** |
| HEARTLAND PAYMENT SYSTEMS, LLC, successor in interest to HEARTLAND PAYMENT SYSTEMS, INC., | : : : : : | |
| Defendant. | : : : | |

<u>**WOLFSON, Chief Judge**</u>:

Plaintiff Joseph Soranno ("Plaintiff") filed this putative class action against Defendant Heartland Payment Systems, LLC ("Defendant" or "HPS") for breach of contract, unjust enrichment, and violations of the New Jersey Sales Representatives' Rights Act ("SRRA") and the New Jersey Wage Payment Law ("WPL"). Plaintiff, a former HPS sales representative, alleges that Defendant failed to pay him certain vested commissions for services he sold during his employment. Presently before the Court are Defendant's Motion for Summary Judgment on all claims against it and to Strike Plaintiff's Jury Demand, and Plaintiff's Motion for Partial Summary Judgment on his breach of contract, SRRA, and WPL claims. For the reasons set forth herein, Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part; summary judgment is granted in Defendant's favor on Plaintiff's unjust enrichment, SRRA, and WPL claims and denied on Plaintiff's breach of contract claim. Defendant's motion to strike Plaintiff's demand

for jury trial is **GRANTED**.  Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

Plaintiff's breach of contract claim shall proceed.

## I.  BACKGROUND AND PROCEDURAL HISTORY

### a. Defendant's Business

Defendant sells, among other things, card payment processing services to merchants and retailers.  (Def. Statement of Undisputed Material Facts ("Def. SUMF") ¶ 1.)[1]  Since its creation in 1997, Defendant has processed bank-issued Visa and Mastercard payments.  (*Id.* ¶ 2.) Specifically, Defendant enters into written agreements with merchants under which it collects fees for processing Visa and Mastercard payments in addition to "interchange fees" charged by Visa and Mastercard.  (*Id.* ¶ 3.)  For merchants who processed Visa and Mastercard payments through Defendant, Defendant was responsible for, *inter alia*, negotiating its contract with the merchant, assessing the merchant's creditworthiness, providing customer service to the merchant, collecting money from Visa and Mastercard to fund the transactions, making payments to the merchants for approved transactions, collecting fees from the merchants, and monitoring fraudulent activity and processing chargebacks.  (*Id.* ¶ 4.)  Under these agreements, Defendant is also responsible for bad Visa and Mastercard payments.  (*Id.* ¶ 5.)  Defendant earned income from Visa and Mastercard transaction based on margin, the fees it charged merchants on top of the interchange rates, less its operating costs, including any liabilities.  (*Id.* ¶ 6.)  As long as the merchant continues to process Visa and Mastercard payments through Defendant, Defendant earns margin.  (*Id.* ¶ 7.)

Defendant also provides other ancillary services to merchants.  Relevant here, from December 2007 to July 2014, Defendant acted as a sales agent for American Express ("AMEX"),

---

[1]     Except where noted, Plaintiff does not dispute the following facts related to Defendant's business practices for the purposes of these Motions.

a third-party that offered its own card payment processing services to eligible merchants known as the OnePoint card acceptance program ("OnePoint") and ESA. (*Id.* ¶ 8.) In that capacity, Defendant marketed OnePoint services to merchants, who would apply to AMEX for such services. (*Id.* ¶ 9.) If the merchant's application was accepted, the merchant would enter into AMEX's Card Acceptance Agreement, a contract to which Defendant was not a party. (*Id.* ¶ 10.) Under the OnePoint system, AMEX was responsible for processing credit transactions as well as, *inter alia*, charging fees to the merchants, approving or declining transactions, monitoring fraudulent activity, and making payments to merchants for approved transactions. (*Id.* ¶ 11.) According to Defendant, it did not process AMEX transactions and was not financially responsible to AMEX for bad payments. (*Id.* ¶ 12.) Rather, Defendant routed AMEX transactions from merchant terminals to AMEX for processing. (*Id.*) In exchange for acting as its sales agent, AMEX paid Defendant a monthly commission of 0.5 percent of the gross dollar volume of payments AMEX processed for the merchants that Plaintiff referred to AMEX. (*Id.* ¶ 13.) AMEX was obligated to pay Defendant monthly commissions for a maximum of 60 months from the date the merchant began using AMEX to process payments. (*Id.* ¶ 14.) Upon the expiration of the 60-month period, AMEX had no further obligation to pay Defendant commissions for OnePoint transactions, even if the merchants continued to use the service. (*Id.* ¶ 15.)

### b. Plaintiff's Employment Contract and Compensation

In January 2007, Plaintiff was hired by Defendant as a Relationship Manager ("RM").[2] (Def. SUMF ¶ 17; Pl. SUMF ¶ 2.) In that capacity, Plaintiff sold Defendant's products and

---

[2]   While the parties do not dispute that Plaintiff was hired and entered into a contract in January 2007, they dispute whether Plaintiff was an "employee."

services, as well as third-party services such as OnePoint, to retail merchants.  (*Id.*)  In exchange, Plaintiff received commission-only compensation.  (Pl. SUMF ¶ 2.)

In December 2007, Plaintiff was promoted to the position of Territory Manager.  (Def. SUMF ¶ 18.)  As part of that promotion, Plaintiff and Defendant entered into a Territory Manager/Senior Territory Manager Agreement ("TM Agreement"), which superseded "any and all prior written or oral agreements, representations and warranties" between the parties, and could only be modified in writing.  (*Id.* ¶ 19.)  The TM Agreement set forth the terms of Plaintiff's employment as a TM and the following regarding Plaintiff's compensation:

> **Compensation:**  TM/STM shall receive over-ride compensation for merchants signed by Relationship Managers within his or her Territory in accordance with the provisions of the HPS Sales Policy Manual as such manual may be amended from time to time. TM/STM shall receive Relationship Manager compensation for all direct merchant sales as defined in the HPS Sales Policy.

(Moretti Decl., Ex. B ¶ 3.)  With respect to compensation, Defendant retained "the right to modify the costs and methods used to calculate Sales Compensation to be earned for future sales with at least 30 days written notice to active RMs."  (Moretti Decl., Ex. C, at 1.)  However, the Sales Policy provides that "HPS will not modify the costs or methods . . . it uses to calculate Sales Compensation earned by an RM after Installation."  (*Id.*)  In that connection, "[a]ll Sales Compensation will be calculated based on the Sales Compensation Plan in which the RM is participating at the time the completed, signed Contract for products or services is Received by HPS, regardless of whether the Contract represents a new Account, or the sale of additional products or services to an existing Account."  (*Id.*)

The TM Agreement additionally entitles Plaintiff to earn limited and contingent "Vested" rights to certain "Residual Commissions" on specific products and services he sold during his employment after his employment ended.  Specifically, the Vesting provision provides:

> **Vesting**:   TM/STM shall become Vested on the first day of the month following the calendar month in which TM/STM first generates Residual Commissions (including Relationship Manager Residual Commissions and excluding Servicing Residual Commission) exceeding $2,000 for all merchants.  TM/STM must maintain the Minimum Service Requirement as defined in the HPS Sales Policy Manual to continue earning Residual Commissions for each merchant in his or her portfolio.   Once Vested, unless TM/STM's employment is terminated for cause as defined herein, and subject to the rights of HPS to purchase portfolio equity pursuant to Section 5 hereof, TM/STM shall continue to receive Residual Commissions so long as merchants signed by TM/STM or Relationship Manager reporting to TM/STM continue to process bankcard, gift card, check services or payroll transactions through HPS and Minimum Annual Contracts are maintained.

(Moretti Decl., Ex. B ¶ 4.)  The term "Residual Commissions" is defined the Sales Policy[3] as follows:

> **Residual Commission** – A monthly recurring commission.  For Primary Services, Residual Commissions are equal to a percentage (the "Residual Percentage") of the actual Margin generated by an Account each month plus or minus any True-Up Amounts.  For Ancillary Products and Services, Residual Commissions are calculated as described in the respective sections of the applicable Sales Policy.

(Moretti Decl., Ex. C, at 6.)  In other words, "[t]he Sales Policy distinguished between Residual Commissions on 'Primary Services,' which were defined as the 'core services' [Defendant] provided to its customers that generated margin (*e.g.*, Visa and Mastercard), and 'Ancillary Products and Services,' which generally encompassed third-party products and services HPS offered. (*e.g.*, OnePoint)."  (Def. SUMF ¶ 25.)

---

[3]   When referring to the Sales Policy, the Court refers to the 2010-revised version of the Sales Policy, which was in effect during Defendant's employment.  (*See* Moretti Decl., Ex. C.)

Further, the Sales Policy sets forth how compensation was calculated for American Express Card Processing Services, which was an Ancillary Service under the Policy. Specifically, the Sales Policy provides:

> HPS maintains two compensation programs in partnership with American Express ("AXP"): one point and ESA. Subject to the published rules and policies of AXP and HPS in effect at the time of signing, RM shall receive compensation for selling AXP card processing services in accordance with the table below. In no case shall an RM receive compensation unless HPS receives payment from AXP.

| American Express Program | OnePoint | ESA |
|---|---|---|
| Residual Commission – Months 1 thru 12 | 15 Bps of AXP Volume | 8 Bps of AXP Volume |
| Residual Commission – Months 13 thru 36 | 15 Bps of AXP Volume | 4 Bps of AXP Volume |
| Residual Commission – Months 37 thru 60 | 15 Bps of AXP Volume | None |
| Payment of Residual Commissions | 15th of the Month following AXP Volume | 30 days after HPS receives AXP payment |

(*Id.* at 3.)

In December 2012, Plaintiff voluntarily resigned from employment with Defendant. (Def. SUMF ¶ 36.) Consistent with the TM Agreement, Defendant continued to pay Plaintiff his vested commissions after his departure, in the same manner as when he was an active employee. (Pl. Statement of Undisputed Material Facts ("Pl. SUMF") ¶ 8.)

### c. **American Express OptBlue**

In 2013, shortly after Defendant's resignation, AMEX informed Defendant that it would be ending OnePoint and implementing a new service called OptBlue. (Def. SUMF ¶ 47.) On

August 2, 2013, Defendant entered into an agreement with AMEX to offer OptBlue services (the "OptBlue Agreement") which required Defendant to process AMEX payments itself and charge its own fees on top of AMEX's rates.  (*Id.* ¶ 38.)  Essentially, under the OptBlue program, Defendant processes AMEX transactions in the same manner it processed Visa and Mastercard transactions.  (*See id.*)

According to Defendant, "under OptBlue, (1) HPS had to contract directly with merchants' for HPS' processing of AMEX transaction, (2) the merchants, not American Express, would pay HPS for processing, and (3) there was no 60-month or other time limit on HPS' ability to receive payments from merchants for OptBlue transactions."  (*Id.* ¶ 41.)  Defendant states that the transition to OptBlue "meant that HPS had to completely overhaul its business [as it] would now be responsible for the administration, pricing, processing, funding, billing, fee collection, and liability AME had been responsible for under OnePoint."  (*Id.* ¶ 43.)  In June 2014, Defendant's Chief Executive Officer, Robert Carr ("Carr"), sent a letter to all merchants that participated in the OnePoint program to inform them of the transition to OptBlue and explain the changes to the way AMEX transactions would be processed.  (*Id.* ¶¶ 46–47; *see also* Boehnlein Decl., Ex. E.)  Further, "merchants who participated in the OnePoint program received notice of the change to OptBlue, had an opportunity to opt out of OptBlue, and were deemed to have accepted HPS' and AMEX's new terms and conditions if they accepted AMEX card payments through the OptBlue program on or after July 1, 2014."  (*Id.* ¶ 48.)

Plaintiff, however, explains that "[w]hen [AMEX] introduced OptBlue, the Merchant . . . had no choice between pricing programs.  If the Merchant was eligible for the OptBlue program, its only choice was to continue accepting the [AMEX] card as a form of payment and pay the OptBlue prices for processing, or the Merchant could stop accepting the card as a form of

payment." (Pl. SUMF ¶ 20.)[4]  Indeed, according to Plaintiff, "[t]he product/service Plaintiff sold to the Merchants was the same before, during and after conversion to the new pricing" and "there was only one 'sale' made per Merchant—i.e. when Plaintiff convinced the Merchant to process [AMEX] transactions through Defendant."  (*Id.* ¶ 64.)   Moreover, Plaintiff contends that "[a]nything that occurred after the original sale is merely the Merchant opting to continue processing its [AMEX] transactions through Defendant at a new price." (*Id.*)

### d.  Effect of OptBlue on Residual Commissions

In the wake of the transition to OptBlue, Defendant "considered whether it had any compensation obligations to Vested former Sales Employees like Plaintiff, who sold OnePoint but never sold or provided service or support for OptBlue," and it further contemplated whether it would compensate active sales employees on new margin received from OptBlue processing.[5] (Def. SUMF ¶ 51.)  Defendant states that OptBlue differs from OnePoint because it "is a Primary Service that generates Margin in the same way as Visa and Mastercard." (*Id.* ¶ 52.)  In that regard, Defendant interprets the TM Agreement as not requiring it to pay Residual Commissions on margin from OptBlue transactions.   Nevertheless, Defendant "decided to pay Residual Commissions to active Sales Employees who were employed as of July 2014 for transactions processed by merchants who transitioned from OnePoint to OptBlue, which were calculated in the

---

[4]     Plaintiff claims that merchants who did not qualify for OptBlue were permitted to remain on the OnePoint pricing program and that some of Plaintiff's merchants did in fact remain on the OnePoint program.  (*See* Pl. SUMF ¶¶ 20–21.)  In support of this fact, however, Plaintiff points to an email regarding his resignation and a spreadsheet that does not appear to clearly support Plaintiff's version of the facts.

[5]     Plaintiff disputes whether he sold OnePoint specifically, and maintains that he sold to merchants, generally, a processing service for AMEX transactions.

same way as other primary services, like Visa and Mastercard."[6]  (*Id.* ¶ 53.)  During the same time, *i.e.*, July through December 2014, Defendant also "made gratuitous payments to Vested former Sales Employees while it made final compensation determinations."[7]  (*Id.* ¶ 55.)  Nevertheless, in or around January 2015, Defendant determined that "it had no obligation to compensate Vested former Sales Employees (who were not employed by HPS as of July 2014) for OptBlue processing and it made no further OptBlue-related payments to those individuals after January 2015."  It is undisputed that Defendant ceased compensating Plaintiff for AMEX transactions processed by his merchant in January 2015.  (*See* Def. SUMF ¶ 58; Pl. SUMF ¶ 13.)

### e.  Procedural History

On October 15, 2018, Plaintiff filed this putative class action against Defendant in the Superior Court of New Jersey, Mercer County, alleging claims of breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.  (*See* ECF No. 1-1.) Shortly thereafter, on November 16, 2018, Defendant removed Plaintiff's complaint to this Court

---

[6]     Plaintiff claims that a series of emails that were sent to active sales employees modified the Sales Policy, which supports his position that he is entitled to OptBlue commissions.  (*See* Pl. SUMF ¶ 23.)  In these emails, Defendant's Chief Sales Officer, Tony Capucille, explained how the switch to OptBlue would impact compensation policies for AMEX commissions.  (*Id.* ¶ 24.) Specifically, Plaintiff points to an October 31, 2014 email, in which Mr. Capucille highlights that "when Heartland is making profits from a relationship that you (or your teams) built – we focus on ensuring that we are sharing a health portion of those earnings with you."  (*Id.* ¶ 26; *see also* Pl. SUMF, Ex. 18.)  Thereafter, on November 7, 2014, Mr. Capucille emailed all active sales employees and explained that on any merchant account that was converted to OptBlue, their commission would be 30% of the margin on each account.  (Pl. SUMF ¶ 25; *see also* Pl. SUMF ¶ 25.)  Defendant later memorialized these changes in a new version of the Sales Policy Manual on January 1, 2017.  (Pl. SUMF ¶ 27.)  Defendant, however, maintains that those amendments do not apply to Plaintiff or any other terminated sales employee.  (*See* Def. Resp. to Pl. SUMF ¶ 31.)

[7]     Specifically, for July through October 2014, Defendant paid Vested former employees "estimated OnePoint commissions based on pre-July 2014 average monthly OnePoint Residual Commission payments."  (Def. SUMF ¶ 56.)  For November and December 2014, however, Defendant "paid Vested former Sales Employees OptBlue commissions using the same formula applicable to active Sales Employees."  (*Id.* ¶ 57.)

based on the diversity of the parties pursuant to 28 U.S.C. § 1332(a).  (ECF No. 1.)  Following removal, Defendant moved to dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, which the Court granted on July 26, 2019.  (ECF Nos. 21, 22.)  Plaintiff thereafter filed an Amended Complaint, on behalf of himself and all others similarly situated, alleging claims of (1) breach of contract, (2) unjust enrichment, (3) violation of the New Jersey Wage Payment Law, and (4) violation of the New Jersey Sales Representatives' Rights Act.  (ECF No. 23.)

On April 24, 2020, Plaintiff moved for partial summary judgment on his breach of contract, WPL, and SRRA claims.  (ECF No. 37.)  Plaintiff's motion also seeks to invalidate the jury trial waiver set forth in the TM Agreement.  (*Id.*)  That same day, Defendant moved for summary judgment on all Plaintiff's claims and to strike Plaintiff's demand for a jury trial.  (ECF No. 35.)

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law."  *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  *Anderson*, 477 U.S. at 248.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in

his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.   DISCUSSION

### a.  Breach of Contract Claim

Both Plaintiff and Defendant move for summary judgment on Plaintiff's breach of contract claim.  Defendant argues that the express terms of the TM Agreement and Sales Policy bar Plaintiff from receiving post-termination Residual Commissions on OptBlue AMEX transactions.  Plaintiff, however, maintains that the TM Agreement guarantees him Residual Commissions so long as merchants he signed continue to process AMEX transactions through Defendant and that extrinsic evidence demonstrates that Defendant is required under the TM Agreement to continue to pay him Residual Commissions on all OptBlue transactions.[8]

New Jersey law governs Plaintiff's breach of contract claim as the TM Agreement contains a choice of law provision which provides that the "Agreement shall be governed by, and construed in accordance with the laws of the State of New Jersey."  To prevail on a breach of contract claim under New Jersey law, "a party must prove a valid contract between the parties, the opposing

---

[8]      Plaintiff additionally argues that various legal positions that Defendant has taken in other litigation related to the termination of Residual Commissions for AMEX transactions demonstrates Plaintiff's entitlement to summary judgment.  (*See* Pl. Moving Br., at 17–27).  It appears that Defendant has interpreted the TM Agreement and Sales Policy differently in its defense and, according to Plaintiff, "[i]f a Party needs to try, but fail, to justify its actions in so many different ways, then those actions were obviously not contractual performance and obviously not part of the original bargain contemplated by the parties." (*Id.* at 27.)  It is, however, well established that "[l]egal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  As such, other arguments made by Defendant in a separate matter are not dispositive of the Court's determination of whether there exists a dispute of material fact here.

party's failure to perform a defined obligation under the contract, and the breach caused the claimant to sustain[] damages." *EnviroFiance Grp., LLC v. Envt'l Barrier Co.*, 440 N.J. Super. 325, 346 (App. Div. 2015) (citation omitted). The party bringing the suit has the burden of establishing the breach. *Nolan v. Control Data Corp.*, 243 N.J. Super. 420, 438 (App. Div. 1990). Contracts should be construed according to the plain and ordinary meaning of their terms. *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 364 (3d Cir. 2004).[9] "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp.*, 247 F.3d 79, 93 (3d Cir. 2001) (internal quotation omitted). If contractual language is "subject to only one reasonable interpretation," summary judgment may be appropriate. *Arnold M. Diamond, Inc. v. Gulf Coast Trailing, Co.*, 180 F.3d 518, 521 (3d Cir. 1999). Conversely, a contract is ambiguous if it is "susceptible of more than one meaning." *Sumitomo Mach. Corp. of Am., Inc. v. Allied Signal, Inc.*, 81 F.3d 328, 332 (3d Cir. 1996) (quotation omitted). If the meaning of a contract is ambiguous, summary judgment is generally not appropriate.

Here, the relevant provision of the TM Agreement provides that, "[o]nce vested, unless [Plaintiff's] employment is terminated for cause as defined herein, and subject to the rights of HPS

---

[9]     Plaintiff contends that the TM Agreement and Sales Policy are contracts of adhesion that must be construed in his favor. Contracts of adhesion are "agreements that are 'presented on a take-it-or leave-it basis, commonly on a standardized printed form, without opportunity for the adhering party to negotiate.'" *Uddin v. Sears, Roebuck & Co.*, No. 13-6504, 2014 WL 1310292, at *7 (D.N.J. Mar. 31, 2014) (quoting *Muhammad v. Cty. Bank of Rehoboth Beach, Del.*, 189 N.J. 1, 15 (2006)). However, generally speaking, employment contracts are not contracts of adhesion despite the inequality of bargaining power between employee and employer. *See Martindale v. Sandvik, Inc.*, 173 N.J. 76, 89–90 (2002) (finding that employment contract was not contract of adhesion where plaintiff had the opportunity to review agreement and consult with an attorney). Here, Plaintiff was given both the opportunity to read and review the TM Agreement before signing and to consult with an attorney. (Def. SUMF ¶ 21.) Accordingly, the Court declines to treat the TM Agreement as a contract of adhesion.

to purchase portfolio equity pursuant to Section 5 hereof, [Plaintiff] shall continue to receive Residual Commissions so long as merchants signed by [Plaintiff] . . . continue to process bankcard, gift card, check services or payroll transactions through HPS and Minimum Annual Contacts are maintained." (Moretti Decl., Ex. B ¶ 4.)  The TM Agreement incorporates the Sales Policy, which sets forth how Residual Commissions are calculated.  (*See* Moretti Decl., Ex. C.)

The Sales Policy states that "[a]ll Sales Compensation will be calculated based on the Sales Compensation Plan in which the RM is participating at the time the completed, signed Contract for products or services is Received by HPS, regardless of whether the Contract represents a new Account, or the sale of additional products, or services to an existing Account."  (Moretti Decl., Ex. C, at 1.)  The Sales Policy sets forth that Residual Commissions for primary services are calculated based on "the actual Margin generated by the Account during that month."  (*Id.*)  The calculation of compensation for ancillary services, however, differs based on the specific service sold.  Pertinent here, the Sales Policy states:

> HPS maintains two compensation programs in partnership with [AMEX]: OnePoint and ESA.  Subject to the published rules and policies of [AMEX] and HPS in effect at the time of signing, RM shall receive compensation for selling [AMEX] card processing services in accordance with the table below.  In no case shall an RM receive compensation unless HPS receives payment from [AMEX]."

(*Id.* at 3.)  In that connection, the Sales Policy provides that Residual Commissions for OnePoint and ESA transactions were based on volume of AMEX transactions and, for OnePoint transactions, were limited to a period of 60 months following Installation.  (*Id.*)

In essence, the TM Agreement and Sales Policy, together, provide that Plaintiff would continue to receive Residual Commissions after his resignation in the same way he did during his employment so long as merchants he signed during his employment continued to use Defendant's

services.  (*See* Pl. SUMF ¶ 8.)  Indeed, pursuant to these provisions, Plaintiff continued to receive payments for Residual Commissions following his resignation from HPS in December 2012.  (*See* Pl. SUMF ¶ 8; Moretti Decl., Ex. D.)  These payments included Residual Commissions for primary services, AMEX OnePoint transactions, and other ancillary services. (*Id.*)

Plaintiff claims that Defendant materially breached the parties' agreement by ceasing to pay him Residual Commissions for AMEX transactions in January 2014 following the transition to OptBlue.  In response, Defendant argues that two provisions in the TM Agreement and Sales Policy support its decision to terminate Plaintiff's Residual Commissions for AMEX transactions under the OptBlue program.[10]  Defendant contends that the Sales Policy provides that Residual Commissions for AMEX transactions were limited to 60 months[11] and were contingent upon AMEX paying HPS based on gross OnePoint transaction processing volume.  If either of these conditions were not met, Defendant argues that HPS's obligation to pay any commission from AMEX transactions to Plaintiff ceases.  It follows, Defendant argues, that because, under the

---

[10]    At the outset, Defendant argues that that because AMEX transactions prior to OptBlue were not "processed through" HPS, Plaintiff is not entitled to receive Residual Commissions for AMEX transactions.  Put differently, Defendant contends that the only transactions that were processed through HPS prior to OptBlue were Visa and Mastercard transactions, *i.e.*, primary services, and thus, the TM Agreement did not obligate HPS to pay Residual Commissions to Plaintiff for AMEX transactions under OnePoint as HPS did not process those transactions.  That position, however, is untenable given that Plaintiff did in fact receive commissions for transactions processed through OnePoint, and indeed, the Sales Policy expressly set forth how Residual Commissions should be calculated for OnePoint transactions.  Defendant fails to explain how its narrow reading of the TM Agreement can be reconciled with the Sales Policy, which, as discussed above, was incorporated into the TM Agreement.

[11]    While Defendant highlights that OnePoint Residual Commissions were limited under the Sales Policy to a 60-month period, Defendant does not contend that it ceased to pay Plaintiff's AMEX Residual Commissions pursuant to that time limitation, nor is this time frame a point of contention between the parties on these motions.

OptBlue program, AMEX was no longer directly paying HPS based on the volume of transactions, this condition precedent could not be met once the OnePoint program was terminated.

Plaintiff, however, contends that the plain language of the TM Agreement requires defendant to "continue to pay commissions to Plaintiff for as long as his Merchants continue to process [AMEX] card transactions through Defendant." (Pl. Moving Br., at 6.)  Put differently, Plaintiff argues that his right to Residual Commissions flows from the merchant's relationship with HPS rather than the service in which they were enrolled.  Thus, considering the TM Agreement alone, it would appear that Plaintiff may still be entitled to Residual Commissions for AMEX transactions because, based on the record presented on these motions, it appears that merchants did not enter into new agreements with HPS as a result of the transition to OptBlue.

Indeed, the only evidence presented to the Court with respect to the merchants' agreements with HPS is a letter sent by Carr to merchants informing them of the change.  That letter informed merchants that HPS was "simplifying the pricing for your American Express transactions" and that all AMEX transactions would "be billed, by Heartland, at the same Heartland rate as your Visa and MasterCard transactions, in addition to passing through American Express fees." (Boehnlein Decl., Ex. E.)  Merchants were not required to sign any new agreement to accept this change and were instructed that there was "nothing that [they] need[ed] to do" and that "American Express acceptance is subject to the terms of your Heartland Merchant Processing Agreement (MPA) and the American Express Program Supplement." (*Id.*)  The merchant letter suggests that, under OptBlue, AMEX transactions would be governed by the merchant's already existing contract with HPS.  Defendant claims that a merchant's continued acceptance of AMEX transactions acted as acceptance of "HPS' and AMEX's new terms and conditions," but has not

presented evidence of any *new* agreement between HPS and any merchant.[12]  This is a significant

gap in the record, because if merchants entered into new agreements with HPS that govern AMEX

transactions, that new agreement could potentially be an intervening event that could terminate

Plaintiff's right to AMEX commissions for those merchants.  Indeed, as the TM Agreement

provides, Plaintiff's entitlement to Residual Commissions flows from the merchant's relationship

with HP and "so long as merchants *signed by* [Plaintiff] . . . continue to process bankcard, gift

card, check services or payroll transaction through HPS."  (Moretti Decl., Ex. B ¶ 4 (emphasis

added).)  Thus, if a merchant signed a new agreement with HPS as a result of the transition,

Plaintiff might not be eligible for Residual Commissions because he was not involved in the

execution of that new agreement.  Defendant, however, has not presented any evidence that

merchants were required to execute new agreements to transition to OptBlue.[13]

Accepting either parties' interpretation of the TM Agreement and Sales Policy, however,

would require the Court to change the terms of the parties' contract.  Indeed, it is clear from

Plaintiff's argument that he seeks Residual Commissions for AMEX transactions based on margin

and argues that the TM Agreement permits such as a change as it clearly guarantees him

commissions so long as a merchant he signed continues to use Defendant's services.  This

interpretation, however, conflicts with the provisions of the Sales Policy.  Defendant, on the other

hand, seeks to enforce the Sales Policy as written and contends that the change in its relationship

---

[12]     Seemingly, the only relevant document in the record is the "American Express
Supplement," which governs "the processing of American Express Transactions."  (Boehnlein
Decl., Ex. D.)  The Supplement, however, expressly states that it "shall not be deemed an
amendment" to HPS's agreement with the merchant, "but is a supplement thereto for the purposes
of establishing the additional terms and conditions."  Even so, the parties do not discuss the
relevance of the Supplement in their briefing.

[13]     The parties are not foreclosed from submitting any such evidence at later stages in this
litigation, if appropriate.

with AMEX terminates Plaintiff's right to Residual Commissions, even if HPS's agreement with a merchant remains the same.  Such an interpretation of the Sales Policy, however, directly contradicts the vesting provision of the TM Agreement.

In this regard, the parties' arguments demonstrate a tension between the TM Agreement and the Sales Policy.  On the one hand, the TM Agreement appears to guarantee Residual Commissions to vested employees so long as a merchant continues to use Defendant's services and Defendant is receiving fees from the merchant.  The Sales Policy, however, contemplates that commissions will be calculated based on the rate and procedures in effect at the time the sales representative signed the merchant.  It is unclear, then, what the parties intended in a situation where a credit card company, *e.g.*, AMEX, alters its business arrangement with HPS and whether that change would impact Plaintiff's right to Residual Commissions.  On that issue, both the TM Agreement and the Sales Policy are silent as to the effect of such a change on the Residual Commissions paid to a vested sales representative.

To resolve this apparent conflict between the TM Agreement and the Sales Policy, Plaintiff urges the Court to look outside the contract to ascertain the parties' intent.  Where, as here, a contract is silent on certain essential terms, "it is necessary to examine the pertinent provisions in the agreement and the surrounding circumstances to ascertain that intent." *Broadway Maintenance Corp. v. Rutgers, State Univ.*, 90 N.J. 253, 260 (1982); *see also Hall v. Bd. of Educ. of Twp. of Jefferson*, 125 N.J. 299, 305 ("If contract terms are unspecific or vague, extrinsic evidence may be used to shed light on the mutual understanding of the parties.").  While Defendant maintains that extrinsic evidence should not be considered in interpreting the parties' agreement, Plaintiff points to various types of extrinsic evidence in support of his interpretation of the TM Agreement.  For example, Plaintiff highlights certain emails that were sent between Defendant's compensation

department and to its active sales employees regarding the effect the change to OptBlue would have on Residual Commissions. (*See* Pl. SUMF ¶¶ 33–36.) These emails tend to demonstrate that, contrary to Defendant's assertion here,[14] it has continued to pay Residual Commissions, following the transition to OptBlue, to similarly situated active sales employees for transactions processed by merchants who previously participated in the OnePoint program.[15] (*see* Pl. SUMF ¶ 33–36.) Plaintiff argues that the only difference between him and the employees still receiving Residual Commissions is that those sales representatives are still actively employed by Defendant. In response, Defendant asserts that the emails and other extrinsic evidence highlighted by Plaintiff are not necessary to interpret the parties' agreement and have no bearing on Plaintiff's agreement with Defendant. More to the point, because Defendant takes the view that extrinsic evidence is not necessary to interpret the parties' agreement, it does not put forth any evidence on the issue of intent. Even so, the Court cannot resolve the factual issue of the parties' intent on a motion for

---

[14]     Plaintiff further suggests that (1) the emails sent to active sales employees modified the Sales Policy in a way that obligates Defendant to pay him Residual Commissions for OptBlue transactions or (2) the decision to terminate AMEX commissions for vested terminated employees was an improper attempt to modify the TM Agreement. It is well accepted that a contract may be modified by mutual assent, which can be shown "by an explicit agreement to modify, or . . . by the actions and conduct of the parties, so long as the intention to modify is mutual and clear." *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 322 (3d Cir. 2006) (alteration in original) (quoting *Cty. of Morris v. Fauver*, 153 N.J. 80, 99 (1998)). Neither of these actions modified the parties' agreement. First, any emails sent to active sales employees did not apply to Plaintiff, who did not personally receive the emails and had left his employment at HPS before the emails were sent. Moreover, Defendant's decision to cease payment of Residual Commissions for AMEX transactions did not modify the parties' agreement as Defendant could not have unilaterally modified the parties' agreement without Plaintiff's assent.

[15]     As the Court has noted, Defendant did pay Plaintiff estimated commissions for OnePoint transactions from July 2014 to October 2014 and for OptBlue transactions from November 2014 to December 2014. These payments do not obligate Defendant to continue paying these commissions. *See Cty. of Morris*, 153 N.J. at 101–02 ("[I]f a contract clearly demands a specific performance, the fact that the obligor has done more in part performance than the letter of his obligation required should not be used to compel a similar over-performance of the remainder.").

summary judgment.  Accordingly, summary judgment on Plaintiff's breach of contract claim, in favor of either Plaintiff or Defendant, is inappropriate at this time.  In denying both motions for summary judgment, the Court notes that it appears the parties did not adequately take discovery on the issue of intent under these circumstances.  To the extent such discovery is needed, the parties may apply to the Magistrate Judge for limited additional discovery.

      **b.  Unjust Enrichment**

Defendant next maintains that it is entitled to summary judgment on Plaintiff's unjust enrichment claim because the existence of an express contract precludes the finding of an implied contract on identical subject matter.  Plaintiff does not respond to this argument.  As such, Defendant contends that Plaintiff has abandoned this claim.  The Court agrees.  Generally, "[w]here a plaintiff has brought a cause of action which is challenged through a motion for summary judgment as legally insufficient, it is incumbent upon the plaintiff to affirmatively respond to the merits of a summary judgment motion." *Brenner v. Twp. of Moorestown*, No. 09-219, 2011 WL 1882394, at *11 (D.N.J. May 17, 2011) (alteration in original) (quoting *Skirpan v. Pinnacle Health Hosps.*, No. 01-1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010)).  In that connection, "[w]here a party only defends a subset of claims in opposition to a dispositive motion, the Court will construe those claims that were not defended as abandoned." *Person v. Teamsters Local Union 863*, No. 12-2293, 2013 WL 5676739, at *4 (D.N.J. Oct. 16, 2013).  Here, the Court construes Plaintiff's failure to respond to Defendant's motion for summary judgment on his unjust enrichment claim as his intention to abandon the claim.

The claim also fails as a matter of law.  To establish a claim for unjust enrichment, a plaintiff must prove that "(1) at plaintiff's expense; (2) defendant received a benefit; (3) under circumstances that would make it unjust for defendant to retain said benefit without paying for it."

*Maniscalco v. Bro. Intern. Corp. (USA)*, 627 F. Supp. 2d 494, 505 (D.N.J. 2009) (quoting *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004)).  Importantly, "[u]njust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability." *Goldsmith v. Camden Cty. Surrogate's Office*, 408 N.J. Super. 376, 382 (App. Div. 2009) (citation omitted).  Thus, "[b]ecause unjust enrichment is an equitable remedy resorted to only when there was no express contract providing for renumeration, a plaintiff may recover on one or the other theory, but not both." *Caputo v. Nice–Pak Prod., Inc.*, 300 N.J. Super. 498, 507 (App. Div. 1997); *see Amgro, Inc. v. Lincoln Gen. Ins. Co.*, 361 F. App'x 338, 346 (3d Cir. 2010) (affirming summary judgment of the plaintiff's unjust enrichment claim, where an express contract governed the parties' relationship); *Simonson v. Hertz Corp.*, No. 10–1585, 2011 WL 1205584, at *6 (D.N.J. Mar. 28, 2011) ("[A] plaintiff may not recover on both a breach of contract claim and an unjust enrichment claim . . . .").  Here, Plaintiff cannot proceed with an unjust enrichment claim because there is no dispute that the TM Agreement and Sales Policy govern the parties' dispute.  As Plaintiff's unjust enrichment claim stems solely from the contractual relationship between the parties, his unjust enrichment claim fails as a matter of law.  Accordingly, Defendant's motion for summary judgment on the unjust enrichment claim is granted.

### c. WPL

Next, both parties seek summary judgment on Plaintiff's claims pursuant to the New Jersey Wage Payment Law, N.J.S.A. § 34:11-4.1, *et seq.*  The WPL provides, in relevant part that

> Whenever an employer discharges an employee . . . or whenever an employee quits, resigns, or leaves employment for any reason, the employer shall pay the employee all wages due not later than the regular payday for the pay period during which the employee's termination, suspension, or cessation of employment . . . took place . . . or in the case of employees compensated in part or in full by an incentive system, a reasonable approximation of all wages due, until the exact amounts due can be computed.

N.J.S.A. § 34:11-4.3.[16]   The WPL further requires employers to "[n]otify employees of any changes in the pay rates . . . prior to the time of such changes."  N.J.S.A. 34:11-4.6b.  Plaintiff contends that he is an employee under the WPL[17] and that Defendant violated the statute by failing to pay him commissions for OptBlue transactions and by changing his "pay rate" without properly notifying him that Defendant would no longer be paying commissions on AMEX transactions.

The Court first addresses whether Plaintiff is an employee under the WPL.  The statute defines employee as "any person suffered or permitted to work by an employer, except that independent contractors shall not be considered employees."  N.J.S.A. § 34:11-4.1b.  The WPL is, however, silent as to the distinction between employee and independent contractor.  *See Hargrove v. Sleepy's, LLC*, 220 N.J. 289, 306 (2015).  Accordingly, the New Jersey Supreme Court has held that the "ABC" test set forth in New Jersey's Unemployment Compensation Act governs the determination of whether an individual is an employee or an independent contractor for the purposes of the WPL.  *Id.* at 314–16.  The "ABC" test "presumes an individual is an employee unless the employer can make certain showings regarding the individual employed."  *Id.* at 305.  Specifically, an individual is an employee unless the following three factors are met:

(A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

(B) Such service is either outside the usual course of the business for which such service is performed, or that such service is

---

[16]     Under the WPL, "'[w]ages' means the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto."  N.J.S.A. § 34:11-4.1c.

[17]     The WPL defines "employee" as "any person suffered or permitted to work by an employer, except that independent contractors shall not be considered employees."  N.J.S.A. § 34:11-4.1.

> performed outside of all the places of business of the enterprise for which such service is performed; and
>
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession, or business.

N.J.S.A. § 43:21-19(i)(6); *see also Hargrove*, 220 N.J. at 305.  "[T]he failure to satisfy one of the three criteria results in an 'employment' classification." *Hargrove*, 220 N.J. at 305.

The parties' arguments as to whether Plaintiff is an employee under the ABC test are sparse, at best.  Rather than apply the ABC factors, Plaintiff simply avers that he should be considered an employee under the WPL because he was not an independent contractor and he "still receives a monthly paycheck, with taxes withheld, and an annual W-2 Form from Defendant."  (Pl. Moving Br., at 37.)  That, however, ignores the proper definition of employee under the statute. From what the Court can glean from the record, it would appear that Plaintiff is an employee under the ABC test based on the third factor.  Plaintiff did not maintain an independent business that contracted with HPS but, rather, worked directly for HPS to sell its services to merchants.  Nor is there any indication that Plaintiff is customarily engaged in these types of sales and did so independently at any time, either before, during, or after his employment with HPS.  Because Plaintiff cannot satisfy one of the ABC factors, he must be considered an employee under the WPL.

Plaintiff's WPL claim, however, fails because the WPL does not cover post-termination commissions.  While the New Jersey Supreme Court has not addressed this issue, the New Jersey Appellate Division, albeit in an unpublished opinion, has held that the WPL applies only to wages earned by an employee *before* the termination of his employment.  *See Neal v. Eastern Controls, Inc.*, No. A-4304-06T1, 2008 WL 706853 (N.J. Super. Ct. App. Div. Mar. 18, 2008).  In *Neal*, an at-will sales employee sought payment of post-termination commissions for orders that had been

placed, but not yet paid for at the time of his resignation. *Id.* at \*3. The Appellate Division determined that application of the WPL to claims for post-termination commissions would be contrary to the intent of the WPL, explaining that

> Given the regulatory requirement to pay the employee his wages within ten working days of the last date of the applicable pay period, in this case, the last date of employment, it would appear that the entire legislative scheme simply does not apply to the payment of post-termination commissions. If the statute were interpreted to apply to post-termination commissions, the employer would arguably be required to make payment to the employee within ten days of the last date of his employment. Since the consummation of the commission sale may never take place, or may take place weeks or months after the employee's last work period with the company, and may ultimately be subject to modifications or amendments, such a requirement would be both unfair and unworkable.

*Id.* at \*6. Plaintiff attempts to distinguish *Neal* on the grounds that the plaintiff there was an at-will employee who did not have a contract that guaranteed post-termination commissions. However, the Appellate Division's statutory analysis does not make any distinction between the type of employee or what any agreement between the employee and employer indicates. Rather, the Appellate Division's analysis was based on the plain language of the WPL. The Court finds the Appellate Division's reasoning in this regard persuasive. The plain language of the statute makes clear that the WPL is meant to protect only those wages which an employee earned *before* the termination of his employment. *See* N.J.S.A. § 34:11-4.3 ("[T]he employer shall pay all wages due not later than the regular payday for the pay period during which the employee's termination, suspension, or cessation of employment . . . took place . . . ."). Plaintiff, therefore, cannot rely on the WPL to recover unpaid post-termination commissions allegedly "earned" years after his resignation.

For these reasons, summary judgment on Plaintiff's WPL claim is granted in favor of Defendant.

**d.  SRRA**

Both Plaintiff and Defendant also move for summary judgment on Plaintiffs' claim

pursuant to the SRRA.  The SRRA provides that

> When a contract between a principal and a sales representative to solicit orders is terminated, the commissions and other compensation earned as a result of the representative relationship and unpaid shall become due and payable within 30 days of the date the contract is terminated or within 30 days of the date commissions are due, whichever is later.

N.J.S.A. § 2A:61A-2.  A principal who violates the SRRA is liable for all amounts due, treble

damages, and fees and costs.  N.J.S.A. § 2A:61A-3.

Defendant argues that Plaintiff cannot recover under the SRRA because the statute

expressly excludes employees from coverage.  Indeed, the SRRA defines "sales representative" as

> [A]n independent sales company or other person, other than an employee, who contracts with a principal to solicit orders and who is compensated, in whole or in part, by commission but shall not include one who places orders or purchases exclusively for his own account for resale.

N.J.S.A. § 2A:61A-1(c).[18]  The SRRA does not, however, define employee.  Plaintiff urges this

Court to liberally construe the statute to find that Plaintiff is not an employee because he and

Defendant did not have a traditional employment relationship.  Plaintiff, however, fails to offer

any legal support for that assertion, and he does not offer any proposed definition for "employee."

Instead, he argues that the definition used for the WPL should not apply.

---

[18]    There is no dispute that Defendant is a "principal" for the purposes of the SRRA. "Principal" is defined as "a person, including a person who does not have a permanent or fixed place of business in this State, who manufactures, produces, imports, or distributes a product or offers a service; contracts with an independent sales company or other person to solicit orders for the product or service; and compensates those companies or other persons who solicit orders, in whole or in part, by commission."  N.J.S.A. § 2A:61A-1(b).

The Court does not find Plaintiff's argument persuasive.  First, Plaintiff urges the Court to apply a different definition of "employee" for his claim under the SRRA than that which applies to claims under the WPL.  I decline to do so.  It is appropriate to use the same employment test for both the SRRA and the WPL because the statutes serve similar purposes.  In *Hargrove*, the New Jersey Supreme Court observed that "[s]tatutes addressing similar concerns should resolve similar issues, such as the employment status of those seeking the protection of one or both statutes, by the same standards."  220 N.J. at 313.  Here, both the SRRA and WPL are intended to ensure timely and regular payment of wages and commissions to sales representatives and employees, respectively.  *See Kas Oriental Rugs, Inc. v. Ellman*, 407 N.J. Super. 538, 564 (App. Div. 2009) ("[T]he Legislature was motivated by the same concern for sales representatives that led to the adoption of the Wage Payment Law.").  Plaintiff has offered no compelling reason for the Court to stray from those similar purposes and apply a different test of employment to his SRRA claim such that he can potentially recover under both statutes.

Indeed, reading the SRRA and WPL together, it is apparent that the New Jersey Legislature intended the SRRA, which was enacted approximately twenty-five years after the WPL, to protect independent sales representatives that were not covered under the WPL.  *See Neal*, 2008 WL 706853, at *7.  This distinction, the *Neal* court observed, "is entirely explainable because an employee, as opposed to an independent sales representative, generally continues to enjoy the benefits of employment right up until the date of determination."  *Id.*  In that connection, the Appellate Division highlighted that "[m]edical benefits and vacation time, for example, continue to inure to the employee's benefit even while his commissions remain outstanding," whereas "[a]bsent some independent contractual undertaking . . . , the independent sales representative who is not employed by the company is only entitled to the commissions he has

26

generated." *Id.* As such, it is evident that an individual is either an employee covered by the WPL, or a sales representative covered by the SRRA, but that an individual cannot be covered by both statutes. Accordingly, it is appropriate to apply the same test of employment to both statutes. Because, as set forth *supra*, Plaintiff is an employee under the ABC test, he cannot recover under the SRRA.[19]

Nevertheless, even if Plaintiff were a sales representative for the purpose of the SRRA, the Court questions whether the SRRA protects post-termination commissions like those sought by Plaintiff. There is no question that the SRRA explicitly requires a principal to pay post-termination commissions to ensure that sales representatives receive commissions for all products or services sold during the term of their contract. *See Neal*, 2008 WL 706853, at *7. However, the SRRA does not appear to apply to the type of post-termination commissions sought by Plaintiff, *i.e.*, those that are regularly paid based on a customer's use of a service. Rather, the language of the SRRA makes clear that the situation the Legislature was concerned about was where an order is placed through a sales representative, but not completed prior to the termination of his employment. N.J.S.A. § 2A:61A-2 ("A sales representative shall receive commissions on goods ordered up to and including the last day of the contract even if accepted by the principal, delivered, and paid for after the end of the agreement."); *see also* N.J.S.A. § 2A:61A-1a (defining commission as "compensation accruing to a sales representative for payment by a principal,

---

[19]     Plaintiff nevertheless urges the Court to find that he was not an employee of HPS based on the remedial purpose of the SRRA. However, "a statute's plain language is the 'best indicator' of legislative intent" and a remedial purpose cannot usurp clear statutory language. *See Brownstone Specialty Fin., Inc. v. Freedom Mortgage Corp.*, 736 F. App'x 333, 335 (3d Cir. 2018). If the Court were to apply some other definition of employee to the SRRA that is different from that under the WPL, Plaintiff would be entitled to recovery under both statutes, which is an absurd result as the WPL is intended to protect the payment of wages for employees and the SRRA for sales representatives, respectively. There is simply no basis for Plaintiff to recover under both statutes under the foregoing analysis.

*earned through the last day on which services were performed by the sales representative*" (emphasis added)).  The Residual Commissions sought by Plaintiff, however, are the result of a unique contractual provision between him and Defendant that is not plainly covered by the SRRA because the commissions in question were not yet "earned" at the time Plaintiff resigned.  While the SRRA is a remedial statute that should be liberally construed, the Court cannot extend its coverage to a situation that was not clearly contemplated by the Legislature.

Accordingly, Plaintiff's SRRA claim cannot survive summary judgment and is dismissed.

### e.  Jury Demand

Finally, Defendant seeks to enforce the TM Agreement's jury trial waiver and Plaintiff seeks to invalidate the same.  The TM Agreement specifically provides that Plaintiff and HPS "irrevocably waive any right to trial by jury in any suit, action or proceeding under, or in connection with or to enforce this Agreement."  (Moretti Decl, Ex. B, ¶ 13(l).)

There is no doubt that "the right of a jury trial is fundamental [and] courts indulge every reasonable presumption against waiver."[20]  *Aetna Ins. Co. v. Kennedy to Use of Bogash*, 301 U.S. 389, 393 (1937); *see also* U.S. Const., amend. VII ("In Suits at common law, . . . the right of trial by jury shall be preserved . . . .").  Nevertheless, a waiver of the right to a jury trial is valid where such waiver is made knowingly and voluntarily.  *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 222 (3d Cir. 2007); *McPeak*, 2014 WL 4388562, at *5.  A waiver is knowing and voluntary "when the facts show that (1) there was no gross disparity in bargaining power between the parties, (2) the parties are sophisticated business entities, (3) the parties had an opportunity to negotiate

---

[20]     Where the district court has jurisdiction based on diversity of citizenship, federal law governs the question of whether the parties have validly waived any right to a jury trial.  *See McPeak v. S-L Distribution Co., Inc.*, No. 12-348, 2014 WL 4388562, at *5 (D.N.J. Sept. 5, 2014).

the contract terms, and (4) the waiver provision was conspicuous." *Id.* (quoting *First Union Nat'l Bank v. United States*, 164 F. Supp. 2d 660, 663 (E.D. Pa. 2001)).

Plaintiff's arguments in support of invalidating the jury trial waiver are vague and unpersuasive. First, Plaintiff contends that the waiver is invalid because "Defendant is a huge corporation with substantially more bargaining power than Plaintiff." Defendant, however, argues that there was no gross disparity of bargaining power because Plaintiff could have sought other employment "instead of accepting a promotion to the role of Territory Manager." The Court finds that this factor supports enforcement of the waiver. While there may have been some inequality in bargaining power between the parties, that disparity was not *gross*. Indeed, courts have regularly upheld waivers of jury trial and arbitration provisions in employment contracts despite the inequality in bargaining power. *See, e.g.*, *Martindale*, 173 N.J. at 90 ("Virtually every court that has considered the adhesive effect of arbitration provisions in employment applications or employment agreements has upheld the arbitration provision contained therein despite potentially unequal bargaining power between employer and employee."); *Jiang v. Building Materials Corp. of Am.*, No. A-4269-12T4, 2014 WL 5431335, at *9 (N.J. Super. Ct. App. Div. Oct. 28, 2014) (enforcing jury waiver where "plaintiff offered no evidence that although defendant[] was in a superior bargaining position, it held a monopoly on jobs of the type for which plaintiff was applying"). And, while Plaintiff may not be as sophisticated as Defendant, a corporation, Plaintiff had five years of experience as a finance manager and, further, had worked for Defendant for a year as a sales representative when he entered into the TM Agreement. As such, this factor is satisfied.

With respect to the third factor, there is some dispute as to whether the TM Agreement was negotiable. (*See* Carr Dep. at 26:9–16 (testifying that the TM Agreement was offered on a "take-

it or leave-it" basis); Def. Resp. to Pl. SUMF ¶ 66 (noting that Plaintiff did not submit "any evidence as to the circumstances of Plaintiff's execution of the TM Agreement, including whether Plaintiff asked to modify any of the terms").) However, it is undisputed that Plaintiff signed the contract and admitted at his deposition that he read and understood the jury trial waiver provision and had the opportunity to consult with his own counsel prior to signing the agreement. (*See* Pl. Dep. at 83:23–84:5.) And, finally, the jury waiver provision is conspicuous. While the waiver is not in different or larger lettering that the rest of the TM Agreement, the clause is underlined and clearly described as "Waiver of Jury Trial." (Moretti Decl., Ex. B ¶ 13(l).) Considering these factors, the Court finds the jury waiver to be enforceable. Accordingly, the Court grants Defendant's motion to strike Plaintiff's request for jury trial.

## IV.   **CONCLUSION**

Accordingly, for the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part; summary judgment is granted in Defendant's favor on Plaintiff's unjust enrichment, SRRA, and WPL claims and denied on Plaintiff's breach of contract claim. Defendant's motion to strike Plaintiff's demand for jury trial is **GRANTED**. Plaintiff's Motion for Summary Judgment is **DENIED**. Plaintiff's breach of contract claim shall proceed.

DATED:  September 23, 2020                           /s/ Freda L. Wolfson
                                                     Freda L. Wolfson
                                                     U.S. Chief District Judge